This is Vann v. City of Southaven, Mississippi, and I'm not even going to try to pronounce your name, so if you'd say it nice and slow and loud. I'd be happy to. If you pretend that CZ is an S, my name is pronounced Samanski. Samanski. All right. And my name is Dan Samanski. I represent the appellant and the plaintiff. I'm with the firm of Chapman, Lewis & Swan out of Clarksville, Mississippi. We're here today. The appellant's contention is, in this case, the district court granted summary judgment based on disputed facts, which the court improperly weighed and resolved in favor of the moving party, the defendant or the appellees. Specifically, the lower court determined that Jeremy Vann, the decedent here, operated his vehicle in a reckless and violent manner. That was a conclusion reached by the trial judge numerous times in his opinion. And it's in the context of these factual conclusions that the summary judgment was granted. This conclusion, this specific conclusion, that there was a reckless and violent manner prior to the shooting is contradicted by a number of things. Number one, it's contradicted by the physical evidence. The testimony by the officers is of multiple rammings back and forth by the vehicle driven by Mr. Vann, yet there is no damage that can be seen on the vehicles. And I point out this exception. There's damage noted in the MBI report and damage referenced in the appellee's brief that's referenced in the MBI report. That's damage to the front of one of the vehicles and the passenger side of the vehicle. There was a white Chevy Avalanche in front in a green Ford F-150. That damage, as it came out in discovery, was preexistent. That damage was not caused in this incident. Let me ask you this because there's the prong to the qualified immunity analysis, and essentially it looks at whether there's a case that puts an officer on notice that his or her actions violate clearly established law. And I appreciate your arguments about hope. They haven't found much purchase in any subsequent decisions of the Supreme Court and, therefore, of this Court. And so what case gives us sufficient particularity that was extant at the time of this event that would have put the officers on notice, even assuming Katchen's affidavit to be the accurate accounting of what happened? Because, again, it's not really what's in the head of Katchen's, what's in the head of the decedent. It's not any of that. It's what would an objective officer see, hear, experience, okay? Taking the facts and inferences in favor of the non-movement, but then looking whether there's this particularized case. So what is that case? Okay. Well, the first case was a case cited to the trial court that the trial court simply disregarded, and that was the Goddard case. And I may be pronouncing that wrong. I don't know how it's Goddard. G-O-D-A-W-A versus Berg. It was the trial court said it wasn't even, in a footnote, said, I'm not even going to consider the case because it was decided after this case. However, the Goddard case is applicable for this reason. It was the incident here happened in May of 2014. In the Goddard case, they were looking at an incident that happened in 2012. Goddard did not establish. The case that established that the actions by the officer, in this case Officer Logan, was clearly in violation of the constitutional right, it recognized that that right had been already clearly established. And it was clearly established as of 2012 in the incident that they were looking at. And they cited other cases, including Tennessee v. Gardner, including the Cupp case, I think it was Smith v. Cupp, which was a 2007 case that we also cited. And those are, so those are prior cases. And Goddard was citing those prior cases. There was also the Enya case, Starks v. Enyard, a 1993 Seventh Circuit case that is very, very similar. It's almost exactly what we're claiming in this case, except it's even worse. In that case, those officers are wearing uniforms, the lights are on in the car, and the person who's stolen the taxi backs into the police officer's vehicle that's got lights flashing. And these officers in uniform are standing there, guns drawn. And as he accelerates, guns his car, his stolen car to leave, an officer leaves cover, the cover he has behind the telephone pole, jumps out in front of the vehicle and fires a weapon, justifying it, saying I was in fear for my life. And the cases, so, and there's a number of cases that talk about these vehicle cases. It's essentially, and it starts back with Tennessee Gardner, is that the general proposition, and I realize that's not enough, I'm not saying that this is enough, but the general proposition starts with you cannot shoot a felon or a suspect, let's say, who's fleeing without some good reason. Okay, but you said there's been a number of cases involving these cars, and you didn't cite any of them. Scott v. Harris, Mull and X v. Luna, in which I was on the panel that was reversed 8-1, without even oral argument, on a police officer standing on an overpass, shooting a car coming down an interstate highway, when no one actually was anywhere in the line of this person's car. There wasn't anyone in the line there. Here, there's a bunch of cars around, and you have somebody, at least by everybody's admission, backing up and whatever. So is this really a fleeing felon case, or is this a car case? Well, I think it's a fleeing suspect in a vehicle. I think the difference between Mull and X, for example, is, if I'm remembering right, that one, the individual, I think he called the police and told them, I have a gun, I'm going to kill officers. The person's going over 110 miles an hour. These are all dangerous. In this case, I told you that the judge decided that there was reckless and dangerous action by the defendant. It's undisputed that's what was happening in Mull and X. When you're going 110 miles an hour, when you're calling up the precinct and telling them you're going to shoot cops, that is dangerous, which allowed the officer on the bridge to use, under the court's ruling, to use deadly force. The difference is we don't have that in this case. The dangerousness in this case is disputed. So they have to let him get away and become that person. I mean, to me the problem is you have the – I agree this isn't Mull and X, this isn't Scott v. Harris. Those are more extreme examples, although I disagree that everybody agreed that his driving was dangerous. He's driving 80 miles an hour on an interstate highway in Amarillo, outside of Amarillo, where that's not that uncommon, frankly. But in any event, those are more extreme situations than this. But on the other hand, this is more extreme than the situation of somebody running away on foot, an unarmed person running away. Here we have a guy in a car. And I guess what I'm asking is at what point do the officers have to let him get away and then engage in a high-speed car chase that then creates all the problems that Mull and X and Scott v. Harris are talking about? Well, our position would be it would be the same. Number one, I think it's a decision that needs to be made by a jury based upon disputed facts. And I think if you look at the Godwa case and the Enya case are cases that are very much like this case, unlike the Mull and X case. In those cases, the issue, which the court didn't say, well, the plaintiff automatically wins, but this is an issue that needs to be decided by the jury, is in Godwa, the officer, they say it's disputed if the officer is running towards the car or is the car going towards the officer. In other words, if the suspect is aiming his car towards an officer or veering towards an officer, then that suspect is putting that officer in danger, justifying the officer's shooting. But if the officer is putting himself in the danger and creating the jeopardy and then saying, well, I run to the front of a moving car and now I'm in jeopardy and I can shoot that person, that's officer-created jeopardy that Enya and Godwa, in the other cases they cited, say you can't do that. And I think those cases are more on point because you cannot create the jeopardy, which you use to justify the shooting. If this case is on point, I can't find that you cited this case in your brief. Which case? The Godwa case that you say is the most – did you cite this in your brief? I know I cited it to the trial judge in his order, references a number of times. Right, but this is what you say is what would tell us that it was already clearly established law that the officers couldn't do this, and I can't find where you cited it. Maybe you did, and I'm just missing it. I don't have it by memory. If you want me, I'm happy to look at my brief and see if it's there. Do you believe that's sufficiently factually similar here, that it's not just a grand hope v. Pelletier point, that it doesn't have to be so factually similar, but do you think that case is factually similar? I think the Enya case is similar. I think the Godwa case is similar. I think the Cupp case is similar, yes. Does it matter that Godwa's a Sixth Circuit case? No, there is a – I don't believe so. There was a case that specifically said – I have my notes here. I apologize. I should have this off the top of my head. But there was a case that specifically said the decisions by other circuits are binding on this issue of clearly established law. What case says that? Normally we don't look at it that way. We have a case that says that? Well, Hope v. Pelletier. I'm sorry. I shouldn't have recognized that one. Page 742. Appellate cases from other circuits are binding precedent regarding clearly established. We're going to take a look at that.  I'm sorry, ma'am? Your brief reference is a video. Yes, yes. But maybe just me, where – is this video in the record excerpts? I wasn't – I usually always watch the video because those are really informative. And, in fact, sometimes the video can be dispositive under the Supreme Court's precedent. But I didn't – I wasn't able to access this video. Is this video in the record and is it of the actual incident? Because it just was barely mentioned in passing. The video is in the record. It is barely mentioned because you cannot make – you can't really make out the movements of the – It's in the appellate record for us to watch this video. They may have already watched it. I don't know. And I'm just the only one who can't find it. I thought it was in the record, and maybe they'll address that. I believe it was part of the record and was provided – it was a very long video. It was like two hours, and this all happens in a matter of, you know, a few seconds, 10 seconds, let's say. And this includes the incident? It includes the incident from a distance. And this is actually part of my – part of one of my arguments in the underlying case was the only – the only piece of evidence that the South Haven police handled was the video. It wasn't entered in the evidence logs. They went and got a copy from the store, and there was a store. It was a cricket store. And they got the – they put it on a thumb drive. Then they put it on a hard drive. Then they burned it to a disc. Then they gave it to the sheriff's office. And so when I was asked, I said, I'd like to get it enhanced. I'd like to get the thumb drive where it was originally downloaded. And the thumb drive couldn't be found. And we argued it was spoilation. The hard drive, you know, the only evidence they handled they no longer have, and they never entered it in evidence. And it precluded us from really taking a look at what happened and trying to enhance that. Plus, they had video equipment that they could have used and didn't. So you don't believe the video creates a fact issue? I do think it creates a fact issue for this reason. The one thing you can tell from the video is the officers testified that – They're driving cars that are beat up that don't look like police cars. They contend that they did – part of their identification came when they turned on flashing lights. They call them wigwags. They're, like, in the grill of the vehicle. So you can see when – there are some vehicles that show up after the fact. You know, there's a call, shots fired, and vehicles showing. You can see the vehicles with lights on. You can see the blue lights illuminate the area. When these vehicles pull up, it contradicts their testimony that blue lights were on. You can't hear any sound, so you can't tell if there's a siren or not on the video. But the video contradicts the officers' testimony in that regard, just like the affidavit of Tian Ketchen's contradicts it, just like the physical evidence of the scene contradicts it. So while you have time, why don't you just summarize for us what you say  The disputed issues of material fact are whether the police officer ran towards the vehicle and created the danger or whether the vehicle went towards him and created the danger. And if these facts are disputed by an affidavit filed by Tian Ketchen's, the only sworn testimony by him – But Ketchen's doesn't say the guy was running at him. No, Ketchen says that he puts his hand on the hood, the car goes backwards, and then he fires a shot. Actually, no one says the officer ran to the car except your expert witness or something, but no fact witness says that, no eyewitness says that. No, but the circumstantial evidence, we would argue, says that because that's the great – if you see where his car is in the lot and where he ended up, he had to run towards the car. So I would argue the circumstantial evidence says that. Going back to my summary, the facts of whether the officer created the jeopardy or not are in dispute. The officer's credibility is in dispute, and the court ignored the affidavit, took unsworn statements, considered them, and basically throughout the case weighed the facts, and it's our position that if he did not weigh the facts, this case would fit the clear evidence, clearly established standard under the cases that I mentioned. Thank you. Thank you, Mr. Schmanzke. You've saved time for rebuttal. Mr. Hayes. Good morning, Your Honors. My name is Robert Hayes, and I represent – and along with Co-Counsel Doug Hollowell, we represent the defendants' affilies in this matter, the City of South Haven et al. Your Honor – The city and the officers. The city and the officers, Your Honor. Normally, it's separate counsel that do that on these appeals. Yes, sir. We represent all of them in their individual and official capacities. Your Honor, our contention – the central issue in this case, we're asking for you all to affirm the district court decision, is whether the officers' actions in this case were objectively reasonable. But in order to do that, the court has to know what the facts are. Can you convince us that there are no disputed issues of material fact at all? Your Honor, there are no genuine issues of material fact that would lead a jury to find in favor of the plaintiff. Our position, Your Honor, is that – We don't look at the genuineness note on an interlocutory appeal, though. Your Honor – Genuineness is not something we have jurisdiction over. We only have jurisdiction over material. Your Honor, again, we believe that the position – Is this interlocutory? No, this is not interlocutory. Oh, this isn't interlocutory. I apologize. So this whole thing is final? Yeah, it's been dismissed at the district court level. Okay, I apologize. So you're right. That must be another one I've got. Okay. You scared me there. So material. So it's a genuine and sane material. What we're saying, Your Honor, is that there's no evidence that Mr. Vann has presented that would allow him – no evidence whatsoever. Their only evidence is this affidavit that was obtained at the last hour from – If we think that the affidavit has to be considered, and I know you don't agree with that, but if we think you have to consider it, do you lose? No. Okay. How do you win if the Katchen's affidavit is considered? Your Honor, this is a qualified immunity case, and they must show that there was a violation of constitutional law and that there was clearly established law at the time of the incident that would lead a reasonable officer to believe that his actions were unconstitutional. Are you saying that under that legal standard, it doesn't matter whether the police officers used lights and sirens, whether they wore police vests or badges, whether they shouted police or freeze, whether Vann's car moved toward Logan, when and why Logan left his vehicle and moved toward Vann's car, and when Logan drew his weapon and shot Vann? You're saying that none of those fact issues could possibly matter in terms of the legal standard that you are urging? Your Honor, I'm not saying that none of those fact issues matter, but there's no proof in the record of the way plaintiff's contention is that this occurred. There's no proof in there. Even his own expert is not contending that Officer Logan jumped in front of a moving vehicle. What the evidence will show is there have been nine depositions taken, all of South Haven police officers. What the evidence will show is that these officers jumped out, surrounded this vehicle, he backed up into a police cruiser, pulled forward the first time hitting Officer Logan, backed up and hit a police vehicle again, and came forward, and Officer Logan was trying to get out of the way, and he realized he couldn't. He thought he was going to be run over. He had his hand on the hood, as evidenced by Tion Ketcham's affidavit, as evidenced by the expert, and at that point he shot to prevent from being run over. Now, does that matter whether or not they thought they were drug dealers or police officers? Your Honor, there's no proof. Again, I keep going back to the record. There's no proof in the record that they thought they were police or anything other than police. Well, if there's a fact issue on whether they identified themselves. That's still not a constitutional violation. I believe the plaintiff even conceded in a district court that not all of the officers clearly identified themselves, but I believe they conceded that some did. All of the officers testified under oath in depositions that, at a very minimum, that there were loud sirens going off, that there were multiple officers with lights. As to the light issue and the issue that Counsel Opposite has referenced previously about the video, the video is from about 250 yards, and it shows all the officers going away from the video, and it's very grainy of poor quality. One would not be able to determine by that and that alone whether they had lights on or not because they all had front grill lights and they were all going away from the incident. But even further— But a jury would look at that video and see whether what you say is true or whether, in fact, you can tell enough from a grainy of a video. That's what juries do is look at the evidence and decide what to accept and believe and what not to. But again, Judge Smith, they've conceded in the district court in their own brief that there was some officer identification, and taken as true that they didn't. Let's assume that for a second. That in and of itself is not a constitutional violation. What we have here is a drug dealer going to a drug deal with over an ounce of marijuana, and suddenly people surround him. It's not reasonable to believe that that's anyone other than police officers, particularly in light of the fact that with the sirens and— Your Honor, may I get a sip of water, please? Surely, ma'am, take whatever time you need. Take a deep breath, and you're okay. But it's certainly not reasonable to believe that they thought it was anyone other than. Why is that not reasonable? I mean, don't drug dealers sometimes take on other drug dealers, and you have gang violence and this kind of stuff? Doesn't that happen? Your Honor, in being interviewed by the police officers on the day of the incident, Tian Ketchens was quoted as saying that he knew that there were police. Excuse me, on his recorded statement, they asked him, did you know it was the police? He said he knew. Well, I think he knew, but I told him, I said, they done called the police on you. And further, at the point of 39 minutes to 29 seconds, Ketchens says the most important thing that we're here for today, he said, I imagine the officer thought he was trying to hit him, so he shot him. He's referring to— Okay, but he's now contradicted that with the affidavit, and I understand you think that means we shouldn't consider the affidavit. But if we say no, that's a credibility thing. Ketchens may be not very credible. Maybe a jury will think this guy will say whatever he thinks people want to hear at the moment. But nonetheless, we have his affidavit, which is a different story, at least in part. So if we are to accept Ketchens' affidavit, you said you could still win, and I'm kind of waiting to hear how you still win. Your Honor, the Scott v. Harris case is a case with similar facts, as well as there was a video in that case, but the video— But there was an actual chase. I mean, the car is out there potentially hitting people and so on and so forth. Here we're kind of like pre-Scott v. Harris, and so I asked your counsel—obviously, he didn't really answer it. At what point are the police supposed to sort of let the danger evolve so that they're then justified in shooting, and yet we do have these fleeing felon cases that say you can't just shoot somebody because they might be—or a fleeing suspect might be a felon. Your Honor, if I may address the issue that I started on. As far as Scott v. Harris, though, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, as this case is, so that no reasonable jury could believe it, a court should not adopt the version of the facts for purposes of ruling on a motion for summary judgment. Yeah, but that's a video that contradicts. There is no video that blatantly contradicts here, as far as I— What I'm referring to—I didn't mean to cut you off just now, right? No, it's okay. But what would contradict is the audio and video statements of the witnesses on the scene, not only Tian Ketchens, but they took statements from Lula Williams as well as Henry Miles, who both stated that they knew that there were police officers. She said, I knew there were undercover officers. I knew it 100 percent. Those are the videos that I'm referring to. Right, but those are not sworn, right? Correct. And so we've got a sworn statement against an unsworn. Now, the jury's very—it's very possible the jury would say, I believe him at the scene, not after he's had a chance to go figure out what he wants to say, but we don't get to do that at this stage. Your Honor, again, on this qualified immunity, it's the plaintiff's burden to prove that, one, that there's a constitutional violation, and, two, that there's clearly established law. He didn't take depositions of these people. He hadn't taken Tian Ketchens' deposition. There is no evidence on the record before this court that let them prevail as a matter of law. Even if you take Tian Ketchens' second statement, it says that the officer's hand was on the hood. Therefore, that would put him in front of the car. He describes him as blading across the hood of the car. That being the case, the car comes forward. If the car moves at all, and there's talk of revving engines, and there's pictures that I provided that show clearly that there's a pain exchange between the front of Tian Ketchens' car, which he was driving, and the vehicle driven that Officer Jeff Logan removed himself from, it's clear that there was a lot going on there. But back to I just can't imagine that we're going back to the clearly established law. The plaintiff appellant did not even cite Gadawa in his brief today that we're here for today. Does that matter? I mean, isn't that still law that we would have to abide? It is still law, Your Honor, but if it's such a strong premise for their side, then it would certainly be—one would think that would be the first thing. It is strange. Let's talk about your reliance on Scott v. Harris. It's perfectly legitimate that you would do that, but as you know, in 2014, our court in Thompson v. Mercer said that Scott did not declare open season on the suspects fleeing in motor vehicles, and the real question is whether the suspect posed such a threat that use of deadly force was justifiable. Your Honor, I believe based on the totality of the record, the evidence in the record, that is that there were multiple collisions with police cars, that Officer Logan was hit not once but twice, and he fired only at the point that he was about to be hit the second time. I believe that that is a very serious fleeing felon. And the question is whether Officer Logan and or the other officers believe that they were in a position of danger or that letting Tian Ketchens flee would have put the public in danger. I would like to point the court's attention to the testimony of— deposition testimony of Officer Lance Shepard. He did not shoot but stated that he would have, but he didn't have clear sightline. He had crossfire with another officer. And Officer Jordan Jones obviously took the second shot, and at that point, that's when the car rolled down the forearms of Officer Logan. If these had not been police officers but rather rival gang members or rival drug dealers and Mr. Vann reacted the way he did, would you say that was a reasonable reaction on his part? If these were rival gang members and they got out during a drug deal with guns, would it be— Would it be reasonable for him to try to get away or try to defend himself in some way from being killed? Your Honor, I would think in that hypothetical it would be reasonable to try to get away. Yes, it would. Okay, so does it matter whether there were indications? I mean, everybody believing these are officers to me doesn't answer the question of— Mr. Vann, of course, is tragically dead, and so he can't answer what he was seeing. So the question is what would put him on notice that this isn't a rival gang or other drug dealers or just random criminals but rather are police officers? What puts him on notice of that that isn't contradicted by Ketchen's affidavit? Your Honor, our position would be that it's not what Tian Ketchens believed. It's what the officers believe is happening. In other words, do they believe— Is it objectively reasonable to believe that they are in danger or the public is in danger? In each— But if the officers don't come in with lights and sirens, they don't come in with vests, they don't yell police, then is it reasonable for them to think that these people should just quietly surrender? Are you asking me in a hypothetical, Your Honor? Well, I mean, that's the disputed facts that we're trying to hone in on here. There are disputes about whether there were lights and sirens. There's a dispute about whether they yelled police. There's not much of a dispute that they weren't dressed as police officers. So all of that goes to, you're saying that Mr. Vann's putting people at risk and all of that. He's similar to Scott Harris and to Luna in the Mullinex case, et cetera, et cetera. So the reason that you think they're similar is because he's reacting to police officers. But I'm saying there seems to be a dispute about whether the police officers put anybody on notice of that. Your Honor, I think the plaintiff's appellant conceded that there was some identification but maybe not all of that. And in doing such, there's no constitutional violation that says if you don't, if every officer doesn't have on a police vest that you can't make an arrest. In this case, there were officers that did have police vests on. And as evidence in the record, there were officers that testified. But assuming you're hypothetical and none of them did, it's still not a violation of his constitutional rights by these officers. To what extent does it matter, though, that the officers created this situation? That is to say, it didn't only create a situation of trying to apprehend a suspect in a crime. It created a situation that may have been ambiguous to Mr. Vann in terms of whether they were officers. Are you saying, Your Honor, that the drug bust overall or are you asking me specifically officer identification? I'm saying that the whole setup was carefully planned by the officers, knowing that there was at least an ambiguity about whether they were officers and whether the suspect might have thought that these were just other drug dealers trying to ambush him. Your Honor, one, I don't believe there is ambiguity that they were, that at least three of the five were dressed properly. Okay, well, we've been talking about that. Assuming there's not. Assuming it's ambiguous. There's still not a violation of this Fourth Amendment, right? There's not a constitutional violation, and there's certainly no clearly established law that says if these officers don't identify themselves properly, then they are not entitled to qualified immunity. I know that it's the other side's job to show us a case that says that you're not entitled to qualified immunity, but is there a case that says that if someone is trying to get away under these circumstances that you can shoot them? I believe, Your Honor, the Bazzani case, I believe, is our best case. It was a somewhat similar fact scenario, that they were within 10 to 11 feet, and the officer, the car was moving toward the officer. In that case, the officer couldn't say whether he shot before, during, or as he was going by, but he shot because he reasonably, objectively felt like he was in danger. So he can shoot even if it's not going to be hit, even if the person's trying to get away? If he feels in danger, he can shoot him at that point? If a reasonable officer believes that they were in danger, and obviously we have not won. What if the one who put himself between the car on purpose, I mean, that he placed himself in that position? Are you asking? I didn't understand your question. I'm asking what if the officer's the one who put himself to be in between? That would be the Inyart case that the plaintiff's citing, and that's not what happened here. There's no evidence in this record that says Officer Logan placed himself in the danger zone. None. No objective evidence. The only evidence is that he was hit twice, there was multiple ramming of vehicles, and that he, in fear that he was about to be run over, and it's in the record, it's in his written report that was provided a couple of days after the incident. He's also furthered that with his deposition testimony. He was in fear that he would be injured and that he shot at that point. Does their expert say something that he shot him, he hit him after he hit with the clutch? I think their expert report says, and I apologize for continuing to cut you off. It's okay. Their expert says that it was unreasonable. He doesn't say that he, he said that he put himself in jeopardy, but he also furthers that up. No, but I'm saying that he didn't hit him until after his foot came off the clutch when he got hit. Your Honor, there's no cases out there that says you have to wait to be hit to shoot. He's got his hand placed on the hood of the vehicle. That's in their expert report. And he shot because he knew he was about to be hit. He shot, and he did get hit. And he rolled over the hood of the car and was injured. There's photographs in our brief of him on a backboard. So you can shoot at that point to kill the person driving when you're going to be hit instead of moving out of the way? Yes, Your Honor. I think Plumhoff would support that. That was the case where the officer shot the assailant three times and then shot 12 more times. And the ruling in Plumhoff was you can shoot until you believe the threat is complete, you know, the reasonable threat has subsided. And that's what happened in this case. But, again, going back, and I realize I'm running out of time here, but the issue is was there a constitutional violation? The district court held that it was not, and we believe they were correct in doing so. And the other issue they also have to prove was a clearly established law that would lead Jeff Logan and the other officers to believe that his actions were in violation of one's constitutional right at that moment. And Godowa was not heard, and that decision didn't come down until after this. It should not be considered. There's not a robust consensus of law that would lead them to prevail as a matter of law, and we believe that you should uphold the district court's decision. Thank you, Your Honor. Thank you, Mr. Hayes. Mr. Schmitz, can you save time for rebuttal? Sure. I wanted to note that the Hathaway v. Bazany case was just mentioned, and that's a Fifth Circuit case from 2007. And I read the case last night. I confess sometimes I prepare for these things last minute. I'm reading it last night. Footnote 6, I think it was at the end of the opinion, noted that there's no indication that the officer was using his body as a barricade, distinguishing the case, the Hathaway v. Bazany case, from Starks v. Inyart. And I know, Judge Haynes, maybe you weren't happy with my answer before how the officer has to, whether they let somebody go under what circumstances, but clearly the cases have said well before this case that you cannot on a minor, you've got to consider the grand factors. We have no, this is not somebody who's wanted for murder or assault or any of the big ones like that, but you consider the whole situation. This was a buy of one ounce of marijuana set up by them to bring it down here. I appreciate that, Counselor, but we have Pratt v. Harris County where the alleged crime was a failure to identify himself, and this man ends up hogtied and dead, and our court said qualified immunity. Over my dissent, I might add, but now that's precedent that I have to follow. So it seems like the breadth of the law is not really on your side. Well, in addition to the other cases, and I did note, I did look at my brief. I did not cite the Godwin case, my mistake. I did cite it in my motion, in my response to their motion for summary judgment. But here's yet another case, and this is the Fifth Circuit case, noting specifically, you know, the Starks v. Inyart case and differentiating the Bazany case, saying in this case the guard, he was just walking along. He didn't know what was going to happen, and the car took aim at him, versus the guard like in Inyart where the guard purposely is trying to prevent an escape by stepping out in front of a vehicle, which can be dangerous, and thereby creating the danger, which I say is analogous to our case. Yeah, but you don't have any evidence of that. I mean, you don't have any witness who says he threw himself in front of the car. What we have is circumstantial evidence, and it's part of where he came from, the position of the cars, that the way this position, there's only one place this car can go to get out. And this officer, whose credibility is in question, and that's noted in the briefs, it's in serious question. This is a crooked officer who got fired for being a crooked officer, and that goes to his credibility. He said there's one avenue of escape, and he's not near that avenue of escape when he gets out of his vehicle. But where does he go? He says, well, I'm trying to get out of the way. Well, do we have to just take his word for it, or can we say it doesn't make sense to say you're getting out of the way, but you go to the one spot where this car has a chance to get away, and that's where you go when you're trying to get out of the way. The circumstances of the situation, that circumstantial evidence, I believe we're allowed to argue to a jury, does not make sense in that he must have been running there not to get out of the way but to prevent the escape, just like is not allowed in these cases I cited. I grant you none of the officers will testify to that. In fact, all the officers, nobody ever wants to say where he is when he's shot. But, yeah, by captions, manages, whose credibility is also in doubt, in my humble opinion, gives an affidavit, then doesn't say that. So, I mean, here's a guy that's willing to say a lot of things that contradict an earlier statement and yet does not say, hey, he left, because I don't know that just being somewhere where you could be hit is enough to get you in yard. I think the idea of throwing, like the train is coming down the track and I jump out in front of it versus I'm just kind of wandering around on the track and then there comes the train. Those are two different sets of facts. And captions does not give you Logan throwing himself in front of the car as opposed to just sort of being in the way. Well, and I wasn't relying on, wasn't trying to rely on captions. I was trying to rely on the circumstantial evidence based on the position of the vehicles. And let me just add this, because the circuit, the trial court never referenced our expert report, and I didn't understand it. They quoted the MBI report. The MBI folks were not offered as experts in this case, and they weren't qualified as experts to give opinions. Yet that report is referenced, and there's no mention made of our expert report who testified based on his experience, based on the scene, based on the position of the vehicles, and he reviewed all that, that that's, in fact, what he was doing. He was attempting to block the escape by getting in front, by being just what they said in Hathaway. He's trying to blockade. So the expert specifically says that? Pardon me? The expert specifically says that? Well, I mean, I have to look at it. I don't want to say exactly what he says, but, I mean, we have an expert that addressed many of these areas that I think that's different than all the other cases that are cited. Can you give us the record site you want us to look at on the expert? The record site? You mean on his report is referenced in? What page from the record? Do you have a page cited? If you don't, just tell us. I don't. I don't have it. I'm sorry. Anyway, I see my time is up. Thank you. All right. Thank you, Mr. Tran. Thank you. Your case is under submission. And this morning's session.